FILED

2006 Oct-12  AM 11:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **GLENN WILLIAM HOLLADAY** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Case No.: CV 03-PT-1323-M** |
| ) | |
| **DONAL CAMPBELL** ) | |
| ) | |
| **Respondent.** ) | |

### FINDINGS OF FACT
### AND
### CONCLUSIONS OF LAW

This cause comes on to be heard on Petitioner's Objections to Magistrate Judge's Report and Recommendation filed on May 13, 2006 and a further evidentiary hearing conducted on August 17, 2006.

On August 17, 2006, the court received further amplifications, explanations and evidence from the two expert witnesses who had previously testified before the magistrate judge. The parties agreed that there are no substantial disputes as to the underlying facts and that the substantial disputes relate to the inferences drawn and conclusions reached by the two experts and the magistrate judge. Except to the extent that this court either expressly or impliedly disagrees herein with the report of the magistrate judge his report is hereby adopted. To the extent that there is any conflict between these findings of fact and conclusions of law and the report and recommendation of the magistrate judge these findings of fact and conclusions of law will prevail and apply.

Background

On June 26, 1987, the Petitioner, Glenn Holladay ("Holladay"), was convicted in Etowah

County, Alabama of the murders of Larry Thomas, Jr., Rebecca Ledbetter Holladay and David

Robinson, and the jury recommended a sentence of death. On July 24, 1987, Holladay was

sentenced to death by Judge Donald W. Stewart. On September 20, 1988, the Alabama Court of

Criminal Appeals affirmed those convictions and the sentence. *Holladay v. State*, 549 So. 2d

122 (Ala. Crim. App. 1988). His convictions and sentence were affirmed by the Alabama

Supreme Court on May 5, 1989. *Ex parte Holladay*, 549 So. 2d 135 (Ala. 1989). The United

States Supreme Court declined to issue a writ of certiorari, *Holladay v. Alabama*, 493 U.S. 1012

(1989), and rehearing was denied shortly thereafter. *Holladay v. Alabama*, 493 U.S. 1095

(1990).

Holladay filed a motion for relief from conviction pursuant to Alabama Rule of Criminal

Procedure 32.2 (then Temporary Rule 20) on September 10, 1990. On December 5, 1991, after a

hearing by the trial court, this petition was denied. The denial of this Rule 32 petition was

affirmed by the Alabama Court of Criminal Appeals on December 30, 1992. *Holladay v. State*,

629 So. 2d 673 (Ala. Crim. App. 1992). The Alabama Supreme Court declined to review the

denial of that petition. On February 28, 1994 the U.S. Supreme Court denied Holladay's petition

for a writ of certiorari. *Holladay v. Alabama*, 510 U.S. 1171 (1994).

Holladay then filed a petition for a writ of habeas corpus in this court pursuant to 28

U.S.C. § 2254, with his primary claim being ineffective assistance of counsel. On May 29, 1998,

a magistrate judge of this court filed a Report and Recommendation stating that the petition

should be denied. On July 22, 1998, this court adopted that Report and Recommendation and

denied Holladay's petition. This denial was affirmed by the United States Court of Appeals for

the Eleventh Circuit on April 19, 2000. *Holladay v. Haley*, 209 F. 3d 1243 (11th Cir. 2000). The

Eleventh Circuit denied rehearing and rehearing *en banc*, *Holladay v. Haley*, 232 F.3d 217 (11th

Cir. 2000), and the United States Supreme Court again denied certiorari. *Holladay v. Haley*, 531

U.S. 1017 (2000). Holladay was scheduled to be executed at 6:01 p.m. on May 29, 2003.

Holladay moved the Eleventh Circuit Court of Appeals for leave to file a second petition

for a writ of habeas corpus. Holladay, who claims to suffer from mental retardation, filed this

motion pursuant to 28 U.S.C. § 2244 based on the United States Supreme Court decision in

*Atkins v. Virginia*, 536 U.S. 304 (2002), which held that it was a violation of the Eighth

Amendment of the U.S. Constitution's "cruel and unusual punishment" clause to execute

mentally retarded prisoners.[1] On May 26, 2003, the Eleventh Circuit granted both his motion for

leave to file for a second writ of habeas corpus and his motion for a stay of execution. *In re

Holladay*, 331 F.3d 1169 (11th Cir. 2003).[2]

On June 4, 2003, Holladay filed this petition for a writ of habeas corpus on *Atkins*

grounds. On July 18, 2003, a magistrate judge of this court filed an order that the Respondent's

answer to the petition would be treated as a motion for summary judgment. On January 9, 2004,

the magistrate judge filed a Report and Recommendation suggesting that the motion for summary

judgment be denied. On February 12, 2004, this court filed a Memorandum Opinion adopting in

part and rejecting in part the magistrate judge's Report and Recommendation. The accompanying

---

[1] Typically, the Supreme Court has enunciated a broad principle and left the hard work up to the lower courts. It is easy to state that mildly mentally retarded people should not be executed. It is not so easy to determine who is mildly mentally retarded. For another case where the court wrestled with this issue, *see Rivera v. Dretke*, 2006 WL 870927 (S.D. Tex. Mar. 31, 2006) (unpublished opinion).

[2] The court opinion in that case also provides a history of the proceedings leading up to that opinion.

Order denied both the Respondent's motion for summary judgment and motion to dismiss, and

referred the matter to the magistrate judge for further proceedings on the merits.

On April 14, 2006, the magistrate judge filed a Report and Recommendation suggesting

that Holladay's present petition for a writ of habeas corpus be denied on the merits, asserting that

Holladay had failed to establish his mental retardation by a preponderance of the evidence.[3] On

May 13, 2006, Holladay objected to the Report and Recommendation, arguing that the magistrate

judge had made inappropriate findings of fact and had applied incorrect legal standards. On June

16, 2006, Donal Campbell, the Commissioner of the Alabama Department of Corrections, filed a

response to Holladay's objections.[4]

### General Historical Observations

---

[3]Two "dueling experts" testified before the magistrate judge. The magistrate judge's recommendation is substantially based upon his acceptance of Dr. Kimberly Ackerson's opinions and his rejection of those of Dr. Karen Salekin. Dr. Ackerson's specific opinions may be influenced by her early opinion that Petitioner is not mentally retarded and that further testing was not needed.

[4]Petitioner argues that Alabama law (specifically, Ala. R. Crim. P. 32) does not allow the filing of successive petitions, thereby foreclosing the Petitioner from even attempting to do so before filing an *Atkins* claim in this court. That argument is doubtful. This court does not reach that issue.

This court earlier held that the Respondent had waived the defense of exhaustion of remedies. "Exhaustion of state remedies is not a state law concept; it is a defense in federal court to a federal habeas corpus petition." *Hills v. Washington*, 441 F.3d 1374, 1378-79 (11th Cir. 2006). In a Memorandum Opinion filed February 12, 2004, this court noted:

> For the record, in the answer to the petition for writ of habeas corpus respondent wrote, "Holladay's claim is not exhausted because it has never been raised in state court[,but]....
>
> > *[r]espondent does not allege [that said claim is] unexhausted...* because it would be futile to make this claim in state court because the claim would be procedurally defaulted in state court for a number of reasons (not filed within statute of limitations, filed in successive petition, and not raised at trial or on appeal). *See* Rule 32.2(a)(3), (a)(5),(b) and (c), Ala. R.Crim.P.
>
> Document #10, at 14 n.5)

*In re Holladay*, *supra*, clearly stated that the exhaustion issue was reserved. That opinion was dated May 26, 2003. The above-stated answer was filed on July 8, 2003. The Respondent affirmatively waived the exhaustion defense. For a discussion with regard to whether the presentation of new evidence reopens the exhaustion issue *see Morris v. Dretke*, 415 F.3d 484 (5th Cir. 2005).

The history of mental retardation has been an evolving one, as to stereotyping, definition, treatment, etc. As has been the case with mental illness, there has been improvement in the understanding of mental retardation.[5] The diagnosis of mental retardation remains, however, encumbered by amorphousness comparable to clutching mercury, as illustrated by the contradictory opinions of the experts in this case. The ultimate decision may equate to the game of "Button, button, who's got the button?"[6]

Both experts testified that "one size fits all" with regard to mental retardation determinations. The following language in American Association on Mental Retardation (hereinafter AAMR), *Mental Retardation* (10th ed. 2002) suggests to the contrary:

> The functions or reasons for applying a definition of mental retardation to a person are multiple and may include diagnosis, classification, and/or planning supports. Each function may have multiple purposes. For example, the diagnostic function may be applied to determine eligibility for services, benefits, or legal protections. Likewise, there are different grouping purposes for classification, including service reimbursement or funding, research, services, communication, and so forth. Supports planning for a given person should relate to that individual's strengths and needs in all five dimensions of individual functioning: Intellectual Abilities; Adaptive Behavior; Participation, Interactions, and Social Roles;

---

[5]Some progress is indicated by comparing *Atkins, supra*, with *Buck v. Bell*, 274 U.S. 200 (1927) (all right to sterilize "feeble-minded"). Also *compare Penry v. Lynaugh*, 492 U.S. 302 (1989). It is of interest that after Justice O'Connor noted in *Penry* that only two states prohibited execution of mentally retarded offenders, sixteen additional states and the federal government passed legislation banning the execution of mentally retarded offenders by the time *Atkins* was decided. As will be discussed hereinafter, mental retardation is not considered a mental illness.

[6]"The MR construct is useful in that it allows mostly deserving individuals to get services and supports they often desperately need. It is fiction in that there is no justification for the idea that there is a magical line (let alone one determined by a test score) dividing those who have or do not have this condition." American Association on Mental Retardation (AAMR), *Mental Retardation, infra*, at 35. The magistrate judge stated "[T]he seeming simplicity and clarity of the concept of mental retardation are deceptive." (Report and Recommendation at 7, footnote omitted). The magistrate judge also referred to mental retardation analysis as "convoluted" and involving a "tangled diagnostic template..." (*Id.* at 10). The magistrate judge questioned whether the "definition and application of mental retardation as set out in *Atkins* and Alabama law" meet evidentiary standards required pursuant to Rule 704 of the Fed. R. Ev. and the *Daubert* case. (*Id.* at n.33).

Health; and Context.

*Id.* at 37.  Some determinations may be for the purpose of inclusion of mentally retarded persons; some for exclusion.[7]

Indicative of the evolution is the fact that one of the most subjective essential elements of mental retardation, the adaptive behavior or adaptive functioning factor, was not added to the American Association on Mental Deficiency (AAMD)[8] definition until 1959.  AAMR, *supra,* at 24.  Not only was its inclusion late, "consensus on its construct is still lacking."... "[T]here is no universal agreement on the factor structure of adaptive behavior, the best method to assess it, the role that adaptive behavior or skill deficits should play in the definition and diagnosis of mental retardation and the relationship between the concepts of intelligence and adaptive behavior... . [T]here have been many debates over the accuracy of measuring adaptive behavior (and adaptive skills) ... and whether adaptive behavior assessment should be a requirement for diagnosing mental retardation ..."  *Id.* at 24.[9]

---

[7]For example, *see* the following cases involving social security disability: *Hodges v. Barnhart,* 276 F.3d 1265 (11th Cir. 2001); *Markle v. Barnhardt,* 324 F.3d 182 (3rd Cir. 2003); and *Brown v. Sec'y of Health and Human Servs.,* 948 F.2d 268 (6th Cir. 1991).  For a further discussion of this issue, *see Ex parte Briseno,* 135 S.W.3d 1 (Tex. Crim. App.  2004).  *See also Rivera, supra* n.1.

[8]The American Association on Mental Deficiency is the former name of the American Association on Mental Retardation.

[9]For a full history of the evolution in the development mental retardation standards, *see* James W. Ellis and Ruth A. Luckasson, *Mentally Retarded Criminal Defendants,* 53 Geo. Wash. L. Rev. 414 (1984-85) and R.C. Scheerenberger, *A History of Mental Retardation* (1983).  For a further history, *see City of Cleburne, Texas, et al. v. Cleburne Living Center, et al.,* 473 U.S. 432, 461-465 (1985).  ("Even so, the Court of Appeals correctly observed that through ignorance and prejudice the mentally retarded 'have been subjected to a history of unfair and often grotesque mistreatment.'" *Id.* at 454).  Among other books on mental retardation are: George S. Baroff, *Mental Retardation, Nature Cause and Management* (3rd ed. 1999) and Ronald L. Taylor, *Assessment of Individuals with Mental Retardation* (1997).  *See also* Nava Feldman, *Application of Constitutional Rule of* Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), that Execution of Mentally Retarded Persons Constitutes "Cruel and Unusual Punishment" in Violation of Eighth Amendment,* 122 A.L.R. 5th 145 (2004).

From 1959 to 1973 the AAMR definition of mental retardation included persons with IQ scores of 70-85 as "borderline retarded." "This group is no longer labeled retarded by professionals in the field." Ellis and Luckasson, *supra* n.9, at 422, n.44.[10] "Mildly retarded people have IQ scores in the range between 50 to 55 and approximately 70 and thus have substantial disability." *Id.* at 423.

"Many forms of mental illness are temporary, cyclical, or episodic. Mental retardation, by contrast is permanent. Thus, legal rules which focus upon the prospect of 'curing' mentally ill people may not address the condition of retarded people in an appropriate or useful way." *Id.* at 424 (footnote omitted).[11] The authors further state, however, "The consequences of the mental impairment, including deficits in adaptive behavior may be ameliorated through education and habilitation. Therefore, it is not accurate to state categorically that mental retardation is

---

[10]One reason that the I.Q. level for mental retardation was lowered was to avoid the stigma of persons being classified as "retarded." This may be the same reason that the adaptive behavior element was added. As an illustration of the confusion in this area, the following is a verbatim excerpt from a Federal Bureau of Prisons Forensic Report dated September 22, 2006, with regard to a defendant whose case is pending in this court. The report is signed by a licensed clinical psychologist:

> The defendant was administered the Wechsler Abbreviated Scale of Intelligence (WASI), a commonly used brief screening instrument designed to assess an individual's current level of cognitive functioning. Mr. McCain's WASI results indicated he obtained an overall IQ score of 53 +/-2, (less than the 1st percentile), which falls within the low borderline range of intellectual abilities. His verbal IQ score of 55 +/-3 (less that the 1st percentile), and Performance IQ score of 58 +/-3 (less that the 1st percentile), also fell within the low borderline range.

*Rivera, supra* n.1, states that since 1908 the AAMR or its predecessors have used ten different definitions of "mental retardation." *Id.* at 16.

[11]This court recommends a full reading of Ellis and Luckasson, *supra* n.9. "Professor Luckasson was an author of the AAMR's 1992 definition of mental retardation, the version relied upon in *Atkins* and Alabama" (Magistrate Judge's Report and Recommendation at 8, n.5). The court also recommends a full reading of Baroff, *Mental Retardation, Nature, Cause, and Management* (3rd ed. 1999).

'permanent' or 'incurable.'"[12]  There is no evidence that the Petitioner has ever had such
education or habilitation.

### Petitioner's Objections

The Petitioner's objections can be summarized as follows:

1. "The magistrate judge incorrectly found that the IQ scoring cutoff for a finding of
mental retardation is 70 or below..."  The cutoff as stated by the magistrate judge fails to
recognize the well established rule that the IQ cutoff for mental retardation is 70 *plus or minus
five points*.  *See Atkins*, 536 U.S. at 309, n.5.[13]

2. The magistrate judge erred in finding that the WAIS is the "most universally applied
standardized testing instrument, in part because Stanford-Binet exams typically generate lower
IQ scores."

3. The Petitioner objects to the magistrate judge's conclusion "which questions the
validity of the IQ examination[s] performed on the Petitioner in 1958," in which he scored 49
and 56.

4. The Petitioner objects to the magistrate judge's conclusion "that the opinions of Dr.
Kimberly Ackerson are 'well reasoned and better supported by the record than Dr. Salekin's
view' thus accepting Dr. Ackerson's assessment of the Petitioner as functioning in the borderline
range of intelligence."

_____

[12]In *Cleburne Living Center v. City of Cleburne, Tex.*, 726 F.2d 191, 198 (5th Cir. 1984) the court stated
that the condition of the mentally retarded is "immutable."  The Supreme Court agreed in *City of Cleburne Texas, et
al v. Cleburne Living Center, supra* n.9.  "The vast majority [of the mentally retarded] - approximately 89% - are
classified as mildly retarded, meaning that their IQ is between 50 and 70."  *Id.* at 443, n.9.  "Mental retardation is
caused by a variety of factors, some genetic, some environmental, and some unknown."  *Id.*

[13]As will be indicated hereinafter, this is not necessarily the Alabama law.

5. The magistrate judge erred in discounting the import and findings of the Woodcock-Johnson test administered by Dr. Salekin.

6. The Petitioner objects to the magistrate judge's total rejection of the retroactive use of the Scales of Independent Behavior-Revised (SIB-R) test.

7. The Petitioner objects to the magistrate judge's rejection of all forms of adaptive functioning testimony except for school, social service and prison records.

8. The magistrate judge erred in not giving sufficient weight to the Petitioner's intellectual and adaptive functioning skills prior to the age of 18, including health and safety factors; academic difficulties; IQ scores of 49 and 56 (1958) and 54 (1963); reports of a school principal, a special education teacher and a physician; DHR records which refer to petitioner as mentally retarded; and the testimony of family members and friends.

9. The magistrate judge did not give sufficient weight to the following IQ test scores of Petitioner:

> 1978 - 69
> 1979 - 72
> 1987 - 71
> 1991 - 65

even though Dr. Ackerson viewed the four tests as being reliable and valid.

### Respondent's Response to Objections

1. The Respondent did not specifically respond to the "70 and 75" or lower objection of the Petitioner. The Respondent generally argues that the "magistrate correctly applied the proper legal standard..." and that "Holladay completely fails to show how this alleged failure entitles him to a different outcome."

2. The Respondent argues that the magistrate judge's finding that WAIS-III is the

preferred assessment is supported by the evidence including the testimony of Dr. Salekin.

3.  The Respondent supports the magistrate judge's questioning of the validity of the IQ examinations in 1958.  This support purportedly comes from the testimony of Dr. Ackerson concerning the inconsistency of the scores.

4.  Respondent agrees with the magistrate judge's conclusions that Dr. Ackerson's opinions are better supported than those of Dr. Salekin, even though Dr. Ackerson did not administer an intelligence test because she had decided that it would not be helpful.

Further, Respondent argues, Dr. Ackerson did, in fact, contact third parties and considered records which contained information from third parties.

5.  Respondent argues that the Petitioner does not dispute that Woodcock-Johnson is an achievement test and not an intelligence test.

6.  Respondent argues that even Dr. Salekin acknowledged that her use of SIB-R was unorthodox in this case.

7.  Respondent says there  is nothing in the record to suggest that the magistrate judge did not consider all the evidence concerning Holladay's adaptive functioning.

8.  Respondent says that the magistrate judge carefully considered the evidence concerning the petitioner's intellectual and adaptive functioning before he turned 18.

9.  Respondent argues that the magistrate judge carefully considered the Petitioner's intellectual functioning and adaptive functioning as an adult and that the evidence supports Dr. Ackerson's view that Petitioner is not mentally retarded even though she believes that his adult IQ scores (ranging from 65 to 72) are reliable and valid.

Standards of Review

It is settled in the Eleventh Circuit that the district court must rule on the merits of each and every claim discussed in the magistrate judge's report and recommendation. *Callahan v. Campbell*, 396 F.3d 1287, 1289 (11th Cir. 2005) ("When a district court does not address all such claims, we 'will vacate the district court's judgment without prejudice and remand the case for consideration of all remaining claims whenever the district court has not resolved all such claims.'") (*quoting Clisby v. Jones*, 960 F.2d 925, 938 (11th Cir. 1992)).[14] "[A] district court judge need not rehear the testimony on which the magistrate relied in accepting the magistrate's findings or recommendation. Rather...the statutory command to district court judges to 'make a de novo determination' of those portions of the magistrate's findings and recommendations to which the parties object is satisfied as long as the judge, rather than the magistrate, exercises 'ultimate adjudicatory power.'" *Proffitt v. Wainwright*, 685 F.2d 1227, 1237 (11th Cir. 1982) (*quoting United States v. Raddatz*, 447 U.S. 667, 674-76 (1980)). "[I]n a situation involving the constitutional rights of a criminal defendant...the district judge should not enter an order inconsistent with the credibility choices made by the magistrate without personally hearing the live testimony of the witnesses whose testimony is determinative." *Louis v. Blackburn*, 630 F.2d 1105, 1109 (5th Cir. 1980).

Determining whether the order of the district judge is "inconsistent with the credibility choices made by the magistrate" is a two-step process. "First, we must review the magistrate's recommendation and decide whether credibility choices he made in assessing [a claim] were dispositive. If the answer is affirmative, we must then scrutinize the district court's order to

---

[14]Note that the reference is to "claims," not "objections." Here, there is only one "claim." That claim is that Petitioner is mentally retarded.

ascertain if the judge's rejection of the magistrate's recommendation was also a rejection,

whether express or implied, of the magistrate's credibility choices." *Proffitt*, 685 F.2d at 1237.

"The rationale for requiring district judges to rehear testimony before rejecting credibility choices

made by a magistrate lies in the recognition that credibility choices frequently depend on the trier

of fact's assessment of the witness's demeanor...[u]nless the words spoken by the witness are

inherently ambiguous, however, the decision whether a second hearing is necessary must be left

to the sound discretion of the district judge." *Id.* at 1243.

"Findings of fact made by a United States magistrate...and which are accepted and

adopted by the district court without objection by any party, may be reviewed on direct appeal

only for 'plain error or manifest injustice.'" *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir.

1988) (*quoting Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B 1982)). "Whenever any

party files a timely and specific objection to a finding of fact by a magistrate, the district court

has an obligation to conduct a *de novo* review of the record with respect to that factual issue...To

the extent that the magistrate has made findings of fact based upon the testimony of the witnesses

heard before the magistrate, the district court is obligated to review the transcript or listen to the

tape-recording of those proceedings." *LoConte*, 847 F.2d at 750. "If the district court's account of

the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may

not reverse it even though convinced that had it been sitting as the trier of fact, it would have

weighed the evidence differently." *Id.* "There is little practical distinction between the 'plain

error' standard of review applicable to unchallenged findings of fact by a magistrate and the

'clearly erroneous' standard of review relevant to fact findings by the district judge." *Id.* "[A]n

appellate court must be satisfied that a district judge has exercised his non-delegable authority by

considering the actual testimony, and not merely by reviewing the magistrate's report and

recommendations." *Stokes v. Singletary*, 952 F.2d 1567, 1576 (11th Cir. 1992) (*quoting United

States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. Unit B 1981)).[15]

### Advice from *Atkins v. Virginia*, 536 U.S. 304 (2002)

> "Those mentally retarded persons who meet the law's requirements
> for criminal responsibility should be tried and punished when they
> commit crimes. Because of their disabilities in areas of reasoning,
> judgment, and control of their impulses, *however, they do not act with
> the level of moral culpability that characterizes the most serious adult
> criminal conduct.* Moreover, their impairments can jeopardize the
> reliability and fairness of capital proceedings against mentally
> retarded defendants." *Atkins,* 536 U.S. at 306-307 (emphasis added).

> . . . .

> "The American Association on Mental Retardation (AAMR) defines
> mental retardation as follows: "*Mental retardation* refers to
> substantial limitations in present functioning. It is characterized by
> significantly subaverage intellectual functioning, existing
> concurrently with related limitations in two or more of the following
> applicable adaptive skill areas: communication, self-care, home
> living, social skills, community use, self-direction, health and safety,
> functional academics, leisure, and work. Mental retardation manifests
> before age 18." Mental Retardation: Definition, Classification, and
> Systems of Supports 5 (9th ed.1992).

> The American Psychiatric Association's definition is similar: "The
> essential feature of Mental Retardation is significantly subaverage
> general intellectual functioning (Criterion A) that is accompanied by
> significant limitations in adaptive functioning in at least two of the
> following skill areas: communication, self-care, home living,
> social/interpersonal skills, use of community resources, self-direction,
> functional academic skills, work, leisure, health, and safety (Criterion
> B). The onset must occur before age 18 years (Criterion C). Mental
> Retardation has many different etiologies and may be seen as a final

---

[15]This court has considered the further testimony of the two expert witnesses and has fully read and considered the transcript of the hearing before the magistrate judge.  This court has considered all issues, factual and legal, *de novo.*

common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id*. at 42-43." *Id.* at 308, n.3 (emphasis in original).

. . . .

*"Dr. Nelson administered the Wechsler Adult Intelligence Scales test (WAIS-III), the standard instrument in the United States for assessing intellectual functioning.* AAMR, Mental Retardation, supra, (Emphasis added). The WAIS-III is scored by adding together the number of points earned on different subtests, and using a mathematical formula to convert this raw score into a scaled score. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. A. Kaufman & E. Lichtenberger, Essentials of WAISIII Assessment 60 (1999). *It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.* 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed.2000)." *Id.* at 309, n.5 (emphasis added).

. . . .

"Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* at 405, 416-417, 106 S.Ct. 2595." *Atkins*, 536 U.S. at 317.

"As discussed above, clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318.

### Evidence

The following is underlying evidence which this court divides into these categories:[16]

(1) May Tend to Support that the Petitioner's IQ is 70 or Below;

(2) May Tend to Support that the Petitioner's IQ is not 70 or Below;

(3) May Tend to Show Limitation(s) in Adaptive Functional Behavior;

(4) May Tend to Show the Absence of Limitations in Adaptive Functional Behavior.

The court also includes the results of Scales of Independent Behavior Revised (SIB-R) as administered by Dr. Salekin. This judge gives greater weight to the SIB-R than did the magistrate judge. The magistrate judge questioned the credibility of some witnesses whose testimony is referenced herein. Dr. Salekin, in arriving at her expert opinion, gave credence to the same statements. This court concludes that she was allowed to do so.

The following abbreviations are employed for oft-used terms and persons:

> Scales of Independent Behavior Revised (SIB-R)
> Glenn Holladay (Holladay)
> Raymond Fuqua (RF)
> Mental Retardation (MR)
> Helen Bryan (HB)
> State of Alabama Department of Human Resources (DHR)
> Social Skills (SS)
> Communication (COMM)
> Self-Direction (SD)
> Work (WORK)
> Self-Care (SC)
> Home Living (HL)
> Health and Safety (HS)
> Community Use (CU)

Except as noted, parenthetical citations are to the transcript of the hearing held before the magistrate judge.

---

[16]The court's listing of evidence in this section does not constitute findings of fact.

## 1) May Tend to Support that the Petitioner's IQ is 70 or below

- Holladay's mother drank frequently while pregnant with all of her children, including Holladay. (Magistrate Judge's Report and Recommendation at 45, *citing* DHR records).
- DHR records are "replete" with reports of Holladay's father verbally and physically abusing his wife and children throughout the time they all lived together (Magistrate Judge's Report and Recommendation at 46, *citing* DHR records).
- Holladay failed the 1st and 2nd grades (Salekin, 151:7-10). His formal education ended when he quit school at age 16 (Salekin, 151:21). While in school, Holladay received one C-minus, one D-minus, one D, and the rest were all Fs. In the lower elementary school years, when no letter grades were assigned, he received all "unsatisfactory" marks (Salekin, 152:1-10).
- Holladay's principal stated that Holladay is "definitely" MR (Salekin, 152:11-16).
- Holladay met all criteria for special education but the class was too full to accommodate his admission (Salekin, 152:17-23).
- Holladay once attended special education classes in an Etowah County school. There, a teacher assessment stated that he "did not have the ability to learn on the level of an average child" (Salekin, 153:3-9).
- 1958 IQ tests: at age 9, Holladay scored a 49 and a 56, respectively, on two administrations of the Wechsler test (Salekin, 167:3-4).
- Holladay's mother reports to DHR workers that Holladay is her "slow child or retarded child" in May 1959 (Magistrate Judge's Report and Recommendation at 45, n.41, *citing* DHR records).
- September 1962: Holladay's mother tells DHR that Holladay's teacher was going to seek "special help" for Holladay so that he could learn to read (Magistrate Judge's Report and Recommendation at 50, n.43, *citing* DHR records).
- 1963: noting Holladay's IQ score of 54, a DHR report calls Holladay "barely educable" (*In re Holladay*, 331 F.3d at 1175).
- 1969 IQ test: Holladay scored a 66 (Salekin, 169:20-21). This score was two standard deviations below the mean (Salekin, 170:1-7).
- 1969: A Dr. Wileman concludes that Holladay is MR (Ackerson, 451:19-22).
- Other IQ tests: 69 (1978), 68 (1979), 65 (1991). (*In re Holladay*, 331 F.3d at 1174).
- Average of all IQ test scores, 1958-1991: 64 (*Id.* at 1175).
- Both the trial judge and the prosecutor in Holladay's criminal trial characterized Holladay as "slightly mentally retarded" (*Id.*).
- 2005 Stanford-Binet test: scored a 59 (verbal)/58 (full scale)/61(nonverbal) (Salekin, 179:16).

## 2) May Tend to Support that the Petitioner's IQ is not 70 or below

- Holladay's IQ test scores fluctuate, an indicator of unreliability (Ackerson, 348:19-25).
- Holladay's verbal/performance splits have "flip-flopped" over the years, which casts doubt upon their veracity because consistency in these splits is a hallmark of true MR

(Salekin, 237:4-8).

- A special education teacher in Etowah felt that Holladay's limitations were "environmentally based" and not intellectually based (Salekin, 153:19-23).
- Social Worker's observation of Holladay in 1962: "I believe though it has been Glen's school background, family situation and lack of interest that has thrown him behind more so than a lack of intelligence" (Magistrate Judge's Report and Recommendation at 50, *citing* DHR records).[17]
- Mrs. F.D. Walton (Holladay's teacher) told the DHR social worker in May 1964 that she was "encouraged by Glenn's progress in the remedial class work at Etowah High," that he seemed "more emotionally disturbed because of his family situation than anything else," and that she "did not believe [Glenn's] IQ was too low to enable him to learn" (Magistrate Judge's Report and Recommendation at 53, *citing* DHR records).
- 1979 IQ test: 72 (Salekin, 171:3-4). Others include 73 (1969) and 71 (1987) (*In re Holladay*, 331 F.3d at 1174).
- 1986-87: doctors at Taylor-Hardin opine that Holladay is functioning above the "borderline" intellectual range due to his "level of speech, history of autonomous living, and his streetwise intelligence" (Magistrate Judge's Report and Recommendation at 67).

## 3) May Tend to Show Limitation(s) in Adaptive Functional Behavior Factors

- Holladay could not cook anything substantial, such as a meal for a family (D. Holladay, 25:5-7). **[HL\SC]**
- Holladay did not assist in taking care of his younger siblings (D. Holladay, 25:8-40). **[HL]**
- The Holladay household was not a place where a developmentally challenged individual would have grown up with a great deal of support (Salekin, 141-143). **[HL]**
- Holladay risked serious injury or death by playing frivolously around train tracks while growing up (Salekin, 144:9-15). When asked about this by DHR, Holladay "apparently didn't think there was any danger in it and seemed surprised that the [DHR] worker felt that me might have lost an arm or leg or his life" (Magistrate Judge's Report and Recommendation at 48, *citing* DHR records). **[HS]**
- There is evidence that Holladay might have suffered head injuries as a child. Biomedical factors, such as head injuries, can contribute to MR (Salekin, 145:13-14; 146:15-25; 147:1-14). **[HL]**
- Holladay was seen running away from law enforcement following his sundry illegal conduct. His demeanor was such that he didn't appear to realize the seriousness of it - he would be smiling, as if it were "like a game" to him (Bryan, 53:13-17). **[HS]**
- Holladay attempted to give himself an enema, made a large mess, did not seem embarrassed, and was unable to adequately clean it up (Fuqua, 66:12-25; 67:1-18). **[HS]**
- Holladay can use a standard telephone, but the prison telephones, which require input of numerical codes within a limited time frame, are difficult for him to use because they

---

[17] Some of the DHR records refer to Glenn Holladay as "Glen Holladay."

require "speed, as well as memory," and Holladay has trouble in both areas (Salekin, 157:3-11). **[SC]**

- Holladay, who casually notes his propensity to engage in sexual acts with animals, reports that he does not understand why such conduct with animals would be considered strange, since animals are his "best friend[s]" (Salekin, 178:5-7). **[HS]**
- Holladay was "unaccepted" as a child; "mocked, ridiculed, and teased" by older teenagers; would get into fights; was called "dummy, idiot, crazy." (D. Holladay, 13:19-25) **[SS]**
- Holladay had poor vocabulary. He also had difficulty in understanding conversations and in following set patterns of conduct/behavior (D. Holladay, 14: 3-10). **[COMM]**
- Holladay as a teenager would isolate himself or associate with younger children (D. Holladay, 16:9-25). **[COMM/SS]**
- Holladay could drive but had trouble identifying where he was, and could not relay his whereabouts to others except by landmarks (D. Holladay, 19:4-8). **[SD\COMM]**
- Holladay could not function well at painting job with father and brother; didn't know the difference b/w a scraper and a screwdriver (D. Holladay, 20:1-6). He would not understand what to do, and would grow frustrated and run away (D. Holladay, 20:14-18). Set up a ladder upside down (D. Holladay, 20:23-25; 21:1-9); couldn't be depended on to buy paint for the job (D. Holladay, 21:11-12). **[WORK]**
- Holladay was unable to work the machines at a the Kelly's Tire store where he worked; relegated to manual labor only (D. Holladay, 22: 21-25). **[WORK]**
- Holladay never had a bank account, paid household bills, or rent. All of this would be done by his wives. Holladay did not handle money well (D. Holladay, 23:11-24), but over time he could marginally do so with assistance from his brother (D. Holladay, 24:1-4). **[SC\SD\HL]**
- Holladay's communications skills have not improved since he was a teenager (D. Holladay, 25:19-25; 26:1). **[COMM]**
- Holladay played with Helen Bryan and others her age (10 years younger than Holladay) (Bryan, 50:6-25; 51:1-3); he behaved more like someone of a younger age group (Bryan, 51:6-15), even "childlike" (Bryan, 52:20-21). **[COMM/SS]**
- Holladay told HB's mother that he felt more comfortable in incarceration (Bryan, 54:22-24). **[SS/HL]**
- Holladay sends HB and her mother letters and cards and such; someone else always writes it for Holladay, but Holladay will draw little smiley faces or crosses or something on them (Bryan, 55:7-21). **[COMM]**
- Holladay does not have many friends on death row (Fuqua, 62:12-17). **[SS]**
- Considers Holladay to be "a slow or special needs individual" (Fuqua, 62:19-21); has to talk to him slowly and succinctly for Holladay to understand him (Fuqua, 63:1-5). **[COMM/SS]**
- Holladay has fellow inmates assist him in reading/writing letters, and in filling out "store slips." He cannot perform these tasks himself (canteen order) (Fuqua, 64:3-14). **[SC\SD\COMM]**
- Holladay quit his job as a "runner" on the cellblock because of inmate complaints that he

was not doing the menial jobs satisfactorily (Fuqua, 65:1-19).  However, RF later said that this was more of a case of the inmates having personal dislike for Holladay, not that he could not do the job (Fuqua, 75:6-25; 76:1-4). **[WORK]**

■   Holladay's jobs were menial, and did not require significant intellectual ability.  These are the types of jobs that could be performed by someone with MR (Salekin, 147:18-25; 148:1-8). **[WORK]**

■   Even when Holladay did work, it was not on his own initiative.  Someone else helped him find work (Salekin, 196:8-10). **[WORK]**

■   Someone with mild MR would do well in a prison setting because it is so structured.  Dr. Salekin opines that this explains why Holladay does so well there (Salekin, 159:11-25; 160:1-10). **[HL\SS\CU\SD\COMM]**

■   Holladay is very tangential in conversations.  At times it is very difficult to keep him on track (Salekin, 176:3-17). **[COMM]**


## 4) May Tend to Show the absence of Limitation(s) In Adaptive Functional Behavior Factors

■   DHR worker interviewing Holladay during his boyhood states, "Glen...talked with a fair amount of common sense" (Magistrate Judge's Report and Recommendation at 48, *citing* DHR records). **[COMM/SS]**

■   Holladay was able to move among foster homes "with no difficulty" (Ackeron, 366:12-22). **[SS/CU]**

■   Holladay would get up and get ready for school (D. Holladay, 31:2-4). **[HL/SD]**

■   Holladay was very clean; observed better hygiene habits than his siblings (D. Holladay, 24:11-25); capable of cleaning his room (D. Holladay, 25:1). **[HS]**

■   Holladay could cook eggs (D. Holladay, 25:2-5). **[HL]**

■   Holladay could buy a Coke at a convenience store without assistance (D. Holladay, 24:5-7).  Although Holladay had to have the menu read to him, he was able to choose what he wanted and knew enough to ask that the price specials be read to him (D. Holladay, 34:5-20). **[SC/CU/COMM]**

■   Holladay is able to make small purchases for himself, such as buying a hamburger at a fast food restaurant; works well with paper currency, not as well with change (Salekin, 148:15-24). **[CU]**

■   Holladay could drive a car around town as a young teenager even though illiterate (D. Holladay, 18:20-23).  Later in life, he was able to drive himself back and forth from Atlanta to Gadsden (D. Holladay, 34:22-25; 35:1-4). **[CU/SD]**

■   Holladay can drive a car safely and with navigational accuracy in a familiar place (Salekin, 148:25, 149:1-3).  In unfamiliar places, he picks up hitchhikes and gets information from them (Salekin, 150:1-11). **[SC/SD/COMM/SS]**

■   Holladay did not have trouble following directions at his manual labor job at Kelly Tire in the early 1980s (D. Holladay, 39:4-15). **[WORK/COMM]**

■   Holladay, a diabetic, has learned how to check his insulin level with the blood machine

(Salekin, 156:6-17). **[SC/HS/SD]**

- Holladay is capable of carrying on a conversation; does not have a focus problem (Morgan, 86:13-20). **[COMM]**
- Holladay knew how to use the telephone, cook, and to dress himself (Morgan, 85:6-25). **[HL/SC/SD]**
- Holladay knew how to write (Morgan, 84:22-25; 85:1-3). **[FA]**
- Holladay once worked at a chicken plant (Morgan, 83:10-12), and at a tire store (Morgan, 83:14-15). **[WORK]**
- While a fugitive from the law, Holladay did not call his father because he suspected that the telephone would be bugged (Ackeron, 387:23-25, 388:1). **[SC]**
- In his deposition, Holladay's vocabulary is suspiciously learned (uses words like "approximately") (Ackeron, 385:6-9). **[COMM/SS]**
- While on the run, Holladay knew enough to trade in his car occasionally, sometimes making extra money from the transaction (Ackeron, 383:15-21). **[CU/SD/SC/SS]**
- Holladay consciously pursued women who he wanted to "peep" on (Ackeron, 372:2-10). **[SD]**
- 2 of the 3 members of a psychological reviewing commission found Holladay to be "socially appropriate" (Ackeron, 357:11-18). **[SS]**
- Former psychologist said that Holladay was a "streetwise" individual with the adaptive skills to survive (Ackeron, 355:21-23). **[CU/SD/SS/COMM/SC]**
- Holladay was able to invoke the Fifth Amendment on his own during his deposition, and was able to withstand cross-examination at trial (Salekin, 260-61). **[COMM]**
- Holladay can copy information from one prison form (visitor, telephone) to another (Salekin, 251:1-23). **[COMM]**
- Holladay used an alias to avoid being identified while he was a fugitive (Salekin, 244:1-10). **[SC/SD]**
- Holladay had enough soundness of mind to seek out the cheapest hotels while a fugitive from the law. (Salekin, 242:20-25; 243:1-2) This is seen during his 1986 escape from the Cherokee County Jail and from the three murders later that year (Salekin, 247:8-19). **[SC/SD]**
- Following his escape from Cherokee County Jail in 1986, Holladay managed to elude capture for seven months, driving himself to cities all over the Southeast and Midwest (Salekin, 240:16-22). **[SC/SD]**
- Holladay called his brother after the murders and asked him to come and bring money and to help him (D. Holladay, 19:11-18). **[SC/SD]**
- Holladay knows how to use the telephone (Fuqua, 76:5-9). **[HL]**
- RF says it's possible that Holladay might have been "putting on" at times by pretending not to understand, but could not recall any incidences of this (Fuqua, 72:7-13). **[SD]**
- Holladay stays on topic "for the most part" during conversations (Fuqua, 72:14-17). **[COMM/SS]**
- Holladay initiates assistance from other inmates; it isn't a matter of them going and offering their help, he asks for it (Fuqua, 71:3-6). **[SD/SC]**
- Holladay displays good hygiene and keeps his cell clean, though the guards have to

remind him to clean his cell (Fuqua, 65:20-25; 66:1-5). **[HS]**
- Holladay would be able to respond in his cards and letters to things that HB wrote in cards and letters (Bryan, 59:7-9). **[COMM]**
- Holladay could carry on a conversation w/HB when she visited him in prison (Bryan, 58:1-2). **[COMM/SS]**
- No indication that Holladay has a problem differentiating right from wrong (Salekin, 206:14-24). Holladay's former wife, Jackie Morgan, also testified to this (Morgan, 86:1). Furthermore, the nature of Holladay's crime is such that shows premeditation and strategic planning (Ackerson, 245:16-25-247:1-7).

## 5) Results of Scales of Independent Behavior Revised taken by Bobby & David Holladay

- Holladay's personal living skills (i.e., personal hygiene) at age 13 were age-appropriate (D. Holladay SIB-R)
- Holladay's community living skills at age 17 were on the level of 11 years, 3 months (B. Holladay, SIB-R).
- Holladay's overall functional independence at age 13 was on the level of age 7 years, 8 months (D. Holladay SIB-R)
- Holladay's motor skills at age 13 were on the level of age 7 years, 1 month (D. Holladay SIB-R)
- Holladay's social interaction/communication skills at age 13 were on the level of age 5 years, 9 months (D. Holladay SIB-R)
- Holladay's community living skills (e.g., time and punctuality; money and value; work skills; and home/community orientation) at age 13 were on the level of age 7 years, 5 months  (D. Holladay SIB-R).
- Holladay's functional dependence at age 17 was on the level of age 9 years and 9 months (B. Holladay, SIB-R).
- Holladay's motor skills at age 17 were on the level of age 5 years, 8 months (B. Holladay, SIB-R).
- Holladay's social interaction/communication skills at age 17 were on the level of age 8 years, 8 months (B. Holladay, SIB-R).

In the inevitable appeal, the parties may wish to state additional evidence and how the

evidence should be categorized.

Attached as Exhibit "A" is a form prepared by Dr. Salekin referencing Petitioner's work

history.

## Expert Witnesses

No issue of qualifications of the expert witnesses has been raised by the parties.  Mental

retardation is not a mental illness. Ellis and Luckasson, *supra* n.9, at 415, n.6 ("[a]lthough some psychiatrists and a somewhat larger number of psychologists work with people who are mentally retarded, most members of these professions have no experience and little training in the area of retardation"). "Judgments represent both the best and worst of assessment data. Judgments made by conscientious, capable, and objective individuals can be an invaluable aid in the assessment process. Inaccurate, biased, subjective judgment can be misleading at best and harmful at worst." AAMR, *supra* at 94. The curriculum vitae of the two experts here do not reflect substantial training or experience in the mental retardation area. The single reference to mental retardation in Dr. Ackerson's vitae is that she was once employed by the Alabama Department of Mental Health/Retardation Regional Outpatient Examiner for Jefferson County courts as a certified forensic examiner. There is no statement that any of her work there related to mental retardation.

Dr. Salekin's vitae references to retardation include:

(1) Site Coordinator, National Standardization of the Stanford-Binet Intelligence May 2001 through June 2002. This included fairly extensive work involving SB5.[18]

(2) A presentation in March 2004 on *Mental Retardation: Implications for Forensic Psychologists* to the American Psychology Law Society.

Although not specifically related to mental retardation, Dr. Salekin's vitae reflects substantial experience and writings in the area of mental health malingering.[19] At least "on paper," Dr. Salekin's experience and prolific publications are more extensive and impressive

---

[18]This creates a reasonable inference that the IQ test administered by Dr. Salekin was properly done.

[19]This creates a reasonable inference that she would have recognized malingering by the Petitioner.   The Respondent has criticized Dr. Salekin for not administering a malingering test. Dr. Ackerson did not test at all.

than those of Dr. Ackerson, who has had but one publication. Dr. Salekin's witness experience

regarding mental retardation is more extensive ("[a]pproximately 20 of her prior assessments

involved only the question of mental retardation") than that of Dr. Ackerson who "could not nail

. . . down how many involved the specific question of mental retardation..." There is certainly

reason to believe that Dr. Salekin's qualifications in the mental retardation field are at least equal

to, if not greater, than those of Dr. Ackerson. This court deems them to be greater.[20]

### Conclusions of the Court[21]

### Alabama Law

Notwithstanding the quote from *Atkins* as to "70 to 75," Alabama case law suggests that

the IQ for mentally retarded is 70 or below. *See Ex Parte Perkins*, 851 So.2d 453, 456 (Ala.

2002). *Also see Ex Parte Smith*, 2003 WL 1145475 (Ala. Mar. 14, 2003); *Stallworth v. Alabama*,

868 So.2d 1128 (Ala. Crim. App. 2003).  The *Atkins* and AAMR standards are otherwise

applicable to Alabama.  This court is of the opinion that particular Alabama cases which discuss

the sufficiency of evidence with regard to adaptive behavior and functioning in those cases are

not controlling here.  For example, this case is entirely different from that in *Ex Parte Perkins*,

---

[20]By virtue of her regularly giving reports regarding competency and capacity of criminal defendants to this court, Dr. Ackerson may be better known to the court. She was appointed in this case by the magistrate judge.

The magistrate judge stated, " [M]easurements of particular levels of adaptive functioning have always been and continue to be largely a matter of clinical judgment." (Report and Recommendation at 32). This court deems Dr. Salekin's judgment in this area to be better than that of Dr. Ackerson.

[21]The court assumes and decides that the Petitioner has the burden of proof by a preponderance of the evidence not only with regard to IQ (intellectual functioning) and onset age, but also as to related limitations in the adaptive skill areas.  A good argument could perhaps be made that proof of sub-average intellectual functioning should shift the burden to the Respondent to prove absence of limitations in the adaptive skill areas.  At the state court trial, the court instructed the jury that, "When the factual existence is offered mitigating circumstances are in dispute (sic), the state shall have the burden of disproving the factual existence by a preponderance of the evidence." (R-1762).  The *Atkins* majority noted that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. at 321.

*supra,* where the defendant, while imprisoned, had earned a GED certificate and completed

community college courses, and tested at a full score IQ of 76. Perkins worked for a short time

as an electrician. In considering Alabama cases, it should be determined whether there were any

substantially disputed expert opinions and if there is other distinguishing evidence.

Origination Before Age 18

There is no real question that, whatever mental deficiencies the Petitioner has, they are

significant and began before he was 18. That is substantiated by his early significant academic

problems, his IQ testing, the observations of school officials, etc. This court concludes that

Petitioner has proved that element by more than a preponderance of the evidence.

Significant Limitations
(Sub-Average) in Intellectual Functioning (IQ)

Notwithstanding Dr. Ackerson's rejection, without further testing, of a number of IQ tests

beginning with the Petitioner's early school years, this court concludes that the Petitioner has

proved by a preponderance of the evidence that he has had, since before age 18, significantly sub-

average intellectual functioning as established by a series of tests reflecting an IQ of 70 or below,

and other evidence. In *In re Holladay*, 331 F.3d at 1174-75, the court noted that Petitioner "has

scored as follows: 49 (1958); 56 (1958); 54 (1963); 66 (1968); 73 (1969); 69 (1978); 68 (1979);

72 (1979); 71 (1987); 65 (1991). The mean of these ten scores is 64." After this Eleventh

Circuit opinion, Dr. Salekin tested Petitioner at 58. The overwhelming substantial evidence is

that he has had since before age 18 an IQ of less than 70. This was apparently rejected by Dr.

Ackerson and the magistrate judge based primarily on their perception of inconsistency in the test

scores.

Dr. Ackerson's dismissal of the earlier IQ tests based upon inconsistencies is not

24

supported by any citation of independent authority by her or by the magistrate judge. Dr.

Ackerson acknowledged that "I *don't know* how they [the tests] were administered. *I don't know*

how much effort Mr. Holladay put forth on the particular test, which is the main concern that I

have..." (emphasis added). This would suggest that further testing by Dr. Ackerson was called

for. There is substantial preponderant evidence of an IQ of 70 or below. The test administered

by Dr. Salekin is the latest substantiation.[22] It is significant that, prior to *Atkins*, both the

prosecutor and the sentencing judge acknowledged that the Petitioner was "slightly" mentally

retarded. His mother referred to him as "retarded."[23] This court notes that the term "slightly" is

not a term of art in the mental retardation area. Since the term "borderline retarded" is no longer

---

[22]While both Dr. Ackerson and the magistrate judge somewhat demean the Stanford Binet test, administered by Dr. Salekin, Code of Ala. (2005) § 12-15-90 (j) (2) states: "A borderline retarded person is an individual who is functioning between one and two standard deviations below the mean, and the mildly retarded person is an individual who is functioning between two and three standard deviations below the mean on a standardized intelligence test such as the Stanford Binet scale and measures of adaptive behavior such as the American Adaptive Behavior scale." Again, Dr. Salekin's resume indicates special experience in this area.

During the ten times that Petitioner has been tested over the years, all of the tests, except the recent one by Dr. Salekin, have been by a version of the WAIS (the test favored by the magistrate judge.) There is no evidence that the SB-5 test was not appropriately administered and scored by Dr. Salekin. Neither Dr. Ackerson nor the magistrate judge purport to suggest how the tests at issue were improperly administered nor how the Petitioner, particularly at age nine, malingered. In *Hodges v. Barnhart,* 276 F.2d at 1268-69, the court stated:

> Acknowledging the lack of IQ evidence before age twenty-two, Hodges asserts that absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly consistent IQ throughout her life. We agree. Other appellate courts have recognized this presumption finding that IQ's remain fairly cosntant throughout life. *See Muncy v. Apfel,* 247 F.3d 728, 734 (8th Cir. 2001) ("Mental retardation is not normally a condition that improves as an affected person ages...Rather, a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual fucntioning."); *Luckey v. Us.S. Dept. Of Health and Human Servs.,* 890 F.2d 666, 668 (4th Cir. 1989) (holding absence of IQ test in developmental years did not preclude finding of mental retardation predating age twenty-two and courts should assume an IQ remained constant absent evidence indicating change in intellectual functioning).

[23]"During his school years (which lasted until the sixth grade), Holladay was frequently referred to as slightly mentally retarded or a 'slow learner.'" *In re Holladay,* 331 F.2d at 1175.

appropriate, a person is either "mildly" retarded or more severely retarded, if retarded at all.  The

fact that the Petitioner has been examined for cognitive intellectual purposes ten times during a

period mostly exclusive of his last incarceration suggests a continuing concern in this area by

school officials and others.

Adaptive Behavior Functioning

The two experts agreed that the Petitioner has substantial adaptive deficiencies with

regard to academics.  Thus, a remaining question is whether the Petitioner has substantial

adaptive deficiencies with regard to any of the other ten factors.  This court is satisfied that the

defendant has proved by a preponderance of the evidence that he has such deficiencies in several

areas.

The evidence is overwhelming that the Petitioner has never done and has never been

capable of doing any more than menial work tasks.  His "work" has been infrequent, requiring

little or no skills.  The mere fact that a mildly mentally retarded person is "capable of regular

(competitive) employment, typically in unskilled jobs," does not create a  reasonable inference

that the person is not mildly mentally retarded.  That is considered to be the norm for mentally

retarded persons.  Baroff, *supra* n.9, at 42.  The type "work" performed by the Petitioner is

entirely consistent with the type work which can be performed by the mentally retarded as

described by Professor Baroff.  Even that "work" of the Petitioner was almost non-existent.

It is important, in determining whether a person is or is not mentally retarded, not to pick

and choose so as to over-emphasize certain characteristics.

> Assumption 3: 'Within an individual, limitations often coexist with strengths.'
> This means that people with mental retardation are complex human beings who
> likely have certain gifts as well as limitations.  Like all people, they often do some
> things better than other things.  Individuals may have capabilities and strengths

26

that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation. AAMR, *supra* at 8.

AAMR at 104 states: "F70 *Mild mental retardation.* Approximate IQ range of 50 to 69 (in adults mental age from 9 to under 12 years). Likely to result in some learning difficulties in school. Many adults will be able to work and maintain good social relationships and contribute to society." While even these characteristics do not foreclose a mental retardation determination, Petitioner has not adapted in any of these ways.

Dr. Ackerson agreed that Holladay showed limitations in adaptive functioning as an adult, but believed that ".... some of these limitations, all of these limitations, can *also* be explained in terms of illiteracy, poor experience at school, and also the fact that he was incarcerated for so much in his early adulthood." (Tr-369). The real issue is whether a person with an IQ of below 70 has adapted. It is apparent that Petitioner did not. The key to adaptive behavior is the type support that the individual has received. Where, as here, the individual has had little or no support, the likelihood of adapting is slight, if existent. Dr. Ackerson tends to look upon inappropriate conduct as something separate from mental retardation, rather than as indicating a lack of support which has impeded adaptation. Attached as Exhibit B is Richard J. Bonnie, *The American Psychiatric Association's Resource Document on Capital Sentencing: Implementing Atkins v. Virginia*, Journal of the American Academy of Psychiatry and the Law 32: 304-8 (2004). This court has highlighted particularly pertinent statements which suggest that emphasis by the State on Petitioner's criminal record is misplaced.

There are several areas where this court believes Dr. Ackerson's analysis has proved to be highly questionable. The first, as has been mentioned, is her decision to rely on a somewhat

conclusory determination of no mental retardation  rather than to administer further testing.

When Dr. Ackerson was asked what professional publication she could refer to for her method of

examination, she replied, "It's standard practice.  If somebody comes to me and it's obvious

they're not mentally retarded, it is not necessary for me to give an IQ test." (Tr. 467).[24]  To the

contrary, *see* Ellis and Luckasson, *supra* n.9, at 484-489.  ("In all cases where the defendant is

suspected of being mentally retarded,[25] an individual intelligence test should be administered in

order to formulate an estimate of the defendant's general intellectual functions.  Even if a

defendant has had IQ tests in the past, a new examination should almost always be conducted in

order to provide a comparison to the older test results." *Id.* at 488.)  Since the issue is whether

the Petitioner is presently mentally retarded, it would appear that a contemporary IQ test provides

the most significant proof of sub-average intellectual functioning.

Dr. Ackerson's  adaptive functioning analysis raises further questions.  Dr. Ackerson

somewhat suggests that the Petitioner's condition is explained by his home environment and

treatment rather than mental retardation.  The two are not mutually exclusive. "With *appropriate*

*personalized supports* over a sustained period, the life functioning of the person with mental

retardation will generally improve...[i]mprovement in functioning should be expected *from*

*appropriate supports*, except in rare cases." AAMR, *supra*, at 9 (emphasis added) .  The failure

of the Petitioner to improve in the adaptive behavior area may well be explained by the lack of

---

[24]Dr. Salekin met with and interviewed the Petitioner for two full days plus two additional hours on a third day.  Dr. Ackerson interviewed him for "four to five hours."

[25]The Eleventh Circuit observed in *In re Holladay* that "[i]n this case, we already have held that there is a reasonable likelihood that Holladay is mentally retarded..." 331 F.3d at 1177.  This statement apparently applies to all three elements of the definition of mental retardation.  This court recognizes, of course, that this was not a ruling on the merits.

support, home support or otherwise. There is no evidence that the Petitioner ever had any of the "supports" deemed so important in the AAMR publication *Mental Retardation* (10th ed.).[26] The need for supports as a positive influence is recognized in this text at page 25:

> The 1992 definition placed an added emphasis on assessing a person's current functioning given the impact of changing environmental demands and supports. The definition's assumptions stated that improvements in environmental conditions or the presence of needed supports could positively impact an individual's ability to meet the routine demands of life, thereby improving his or her performance on adaptive skill measures; as a result, the life functioning of the person might improve and, in rare cases, the diagnosis of mental retardation might no longer apply.

It is obvious that negative influences such as parental physical abuse, excessive drinking of alcohol, etc. can have a negative effect. It may be that the Petitioner's condition was contributed to by his mother drinking alcohol during pregnancy and was exacerbated by his home life, including his mother's conduct and abuse from his father. "[S]trong evidence exists that a person who was abused as a child is at risk of suffering long-term effects that may contribute to his violent behavior as an adult." Phyllis L. Crocker, *Child Abuse and Adult Murder*, 77 N.C. L. Rev. 1143, 1158 (1999). There is no reason to believe that such abuse would not have an adverse impact on a mentally retarded person. It may be even more significant as to a mentally retarded person because it could affect his adaptive functioning in general.[27]

---

[26]The magistrate judge's Report and Recommendation has no discussion regarding the supports or lack of supports received by the Petitioner. At one place Dr. Ackerson even seems to suggest that a finding of lack of support is an alternative to a finding of mental retardation rather than an explanation of lack of adaptation. *See* quote in Report and Recommendation at 42.

[27]At the trial, Petitioner's father testified that the Petitioner was beaten at foster homes (R 1692); that his mother was a chronic alcoholic (R 1690); that he was a slow learner (R 1696); that he was married three times (each for a short period) (R1700-01); that he broke both legs trying to escape from jail (R 1703); and that he crawled in his own "dung" while in jail (R 1704-05). David Holladay confirmed the foster home abuses (R 1716). Both the father and David Holladay testified that Petitioner became mean and violent. Holladay's mother drank frequently when she believed she was pregnant. (Report and Recommendation page 45). "The record is replete with reports of Mr.

The magistrate judge at least partially summed up his acceptance of Dr. Ackerson's

opinion and his rejection of Dr. Salekin's as follows:

> With regard to the major disagreements between the experts as to adaptive
> functioning, Dr. Salekin asserted that Holladay's deficits were indicative of
> mental retardation, and Dr. Ackerson opined that Holladay's deficits were
> indicative of willful and anti-social behavior. As will be discussed later herein,
> the court finds that Dr. Ackerson's explanations are well-reasoned and better
> supported by the record than Dr. Salekin's view. Thus, the court credits Dr.
> Ackerson's assessment of Holladay's functioning as borderline intellectual, 'given
> all of the information ..., including the IQ results, [and] his functioning overall ...
> (Tr. 354). (Report and Recommendation at 35).

This court rejects the argument that willful and/anti-social behavior excludes a mental retardation

determination. To the contrary, it suggests that a person whose IQ tests strongly indicate mental

retardation has not adapted.

*Atkins* recognizes that "mentally retarded persons frequently know the difference between

right and wrong and are competent to stand trial. Because of their impairments, however, by

definition they have diminished capacities to understand and process information, to

communicate, to abstract from mistakes and learn from experience, to engage in logical

reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at

318. The magistrate judge, in a somewhat conclusory manner, stated, "Other indications that

Holladay, as an adult, possessed adaptive function skills beyond the merely retarded range were

documentary evidence of the events leading up to the 1986 murder..." (Report and

Recommendation at 76-77). This court is at a loss to see which of the ten factors this bears on.

It would appear that such criminal conduct would indicate at least social limitations. It is

---

Holladay beating the children." *Id.* at 46. The trial court found "that as a child the Defendant was abused and
neglected." (State record at 128). Testimonial references are to the state trial transcript.

doubtful that it bolsters any other factor.  The main legal/medical issue in this case may be whether the ability to commit a crime and temporarily avoid  capture forecloses a determination of mental retardation.[28]

It would appear that a person who has attained adaptive behavior or functioning would have to adjust to society in some positive way.  The Petitioner has not.  He has never exhibited any significant skills in the areas of communication, social skills, community use, functional academics or work.  To the contrary, he has significant and substantial deficits in adaptive behavior in all these areas and, arguably, in other areas as well.[29]  The Petitioner's attitude toward women and animals regarding sex, his "peeping," and his general criminal conduct do not reflect social adaptation.  At the state court trial, the prosecutor continually made a point of the fact that the Petitioner's home life was no worse than that of his siblings and others in his neighborhood.  This may serve to show that the Petitioner, who has been determined to have sub-average intelligence, did not "adapt."

It has been suggested that the Petitioner's long term of imprisonment would somehow interfere with the determination of whether he is presently mentally retarded.  It seems clear, however, that the incarceration would not have improved his condition in any way.  See discussion in Ellis and Luckasson, *supra* n.9, at  479-484.  There is no evidence of any

---

[28]The State has repeatedly referred to Petitioner's crimes as "complicated."  Apparently he came to harm, even kill, his ex-wife and killed all who were present. It was not "complicated."  It was, perhaps, at least partly impulsive.  The Respondent refers to Petitioner's "criminal acumen."  He always got caught.

[29]The 2002 AAMR apparently changed the adaptive skill areas to "conceptual, social, and practical."  This court finds that the Petitioner has not "adapted" in any of these areas.  He does not seem to have any positive skills.  The evidence may suggest that the Petitioner has some practical skills.  Even these "skills" are based on pick and choose evidence.  It does not suggest that he has conceptual or social skills.  Further, there is no reasonable inference that he has ever had the type of supports required to develop adaptive skills.

habilitation.

Dr. Ackerson, again somewhat in a conclusory manner, attributes the Petitioner's history

of working only the most menial of jobs, his poor academic performance, and his anti-social

behavior to an anti-social personality disorder. She acknowledged, however, that anti-social

behaviors and mental retardation are not mutually exclusive and that such disorders could be a

function of mental retardation.

In deciding an issue such as this, a judge has to avoid any consideration of personal

attitude about the death penalty, any personal attitude about the *Atkins* case and any undue

personal attitude about the heinous nature of the offenses committed.[30] In this case, there seems

little doubt that if the Petitioner and his history had been examined before the date of his subject

offenses, a finding of mental retardation would have been made. The only basis for a different

conclusion now would be if the Petitioner's extremely violent conduct and his later temporary

avoidance of capture forecloses a determination of mental retardation. This court does not

conclude that it does.[31]

---

[30]In their *Atkins* dissents, both Chief Justice Rehnquist and Justice Scalia decried the majority's subjectivity. It would be rank hypocrisy for any court to subjectively evade the majority holding. Justice Scalia's dissent provides a good insight to the majority holding. He condemns the majority opinion because it allows those who commit heinous and depraved crimes to avoid the death penalty. He protested that Atkins, who had sixteen prior violent felony convictions and then shot his latest victim eight times could escape the death penalty. This court is bound by the majority opinion, no matter how evil the Petitioner's crime was. Disputes are likely to continue to arise regarding whether state law holdings that the ability to plan and commit crimes avoids findings of mental retardation. Such holdings may be a circular evasion of the *Atkins* majority opinion. *See Clemons v. State*, 2003 WL 22047260 (Ala. Crim. App. June 24, 2005), where the pertinent part of the court's opinion primarily quotes the trial court's order and then adopts its findings without discussion of the legal issues. If such defendants have "adapted," query, to what? *See* Exhibit B. It is likely that any defendant who is convicted of capital murder has committed a heinous crime. Neither *Atkins* nor *In re Holladay* suggest that such crimes render a defendant ineligible for exemption from the death penalty based on mental retardation.

[31]In *Rivera*, *supra* n.1, the court stated, "[t]he underlying crime for which Rivera was given the death penalty is one of the most senseless and brutal crimes that this Court has ever encountered." *Id.* at 47. The Respondent has made substantial reference to Texas law that is not applicable here. Texas law appears to be more restrictive than Alabama law. Regardless, *Rivera* found that Rivera was mentally retarded on evidence less

This court's ultimate decision in this case should indicate its responses to the Petitioner's objections. The court specifically notes the following:

(1) This court agrees that more weight should have been given to the 1958 IQ scores of 49 and 56 (as well as other scores);

(2) This court does not agree that the opinion of Dr. Ackerson that the Petitioner is not mentally retarded is better supported than Dr. Salekin's opinion that he is mentally retarded.

The court ultimately concludes that the Petitioner has proved by a preponderance of the evidence that he is, and has been since before age eighteen, mentally retarded as determined under Alabama law. This conclusion is based on, at least, findings of fact that:

(1) Petitioner has an IQ level of below 70 and has significantly sub-average intellectual functioning.

(2) Said sub-average intellectual functioning has and does exist concurrently with related limitations in the following adaptive skill areas: communication, social skills, community use, self-direction, health and safety, functional academics, conceptual skills, and work; and,

(3) The onset of the aforesaid conditions occurred before Petitioner was 18 years of age.

As earlier indicated, the court in *In re Holladay* stated, "In this case, we already have held that there is a reasonable likelihood that Holladay is mentally retarded ..." 331 F.3d at 1177. This court takes that holding one step further and finds based on a preponderance of the evidence that the Petitioner has been prior to age 18, and is now, mentally retarded.

This court has made an effort to consider the evidence objectively. One could reasonably

---

convincing than that in this case. This court recommends a full reading of *Rivera*. A comparison of some of the arguments made by the state in *Rivera* with those of the State in this case suggest expediency.

argue that decisions as to whether a person is or is not mentally retarded should be left to the consensus of a group of independent experts rather than by judges weighing expert opinions and considering other evidence. Maybe such a process could be available at the appellate level.

Within ten (10) days the Petitioner will file and serve a proposed final judgment.[32]  The Respondent will have ten (10) days thereafter to object as to matters of remedy and form.

This the 12th day of October, 2006.


**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[32]*See* remand directions at the conclusion of *Borden v. State*, 2005 Ala. Crim. App. LEXIS 11, at *7 (Ala. Crim. App. Jan. 7, 2005).

Respondent Name: Glenn William Holladay

Case #: 03-PT-1329-M

eventually be placed in trade school as his impaired cognitive ability would prevent him from succeeding elsewhere.  There are no records to suggest that this placement was made and according to the respondent, he was never provided such services.

## Employment History

The following chronology of employment is created solely on the basis of statements made to this examiner by Mr. Holladay, and statements made by Mr. Holladay to other individuals as documented in the records reviewed for this case (e.g., see exhibit 16).  There were no employment records available nor, with the exception of Mr. Bobby Holladay, were individuals available to discuss the respondent' ability to function in the work place.

Though listed in order from first to last job, the list should not be taken as an exact chronology or a complete listing of work experiences. In between jobs Mr. Holladay was often incarcerated or unemployed, and was taken care of by his wife or other members of his family.  According to both the respondent and Mr. Bobby Holladay, the jobs listed below were not obtained independently, but instead were obtained with assistance of friends or family members.

| Job | Responsibilities | Approx. length of employment | Place of employment (if known) | Reason for leaving |
|-----|-----|-----|-----|-----|
| Service Station | Pumped Gas – stopped fill on the even dollar | 3 months | Gadsden, AL | Couldn't do the job because could not work the cash register and could not read or write – all were reported to be necessary for the job. |
| Chicken Plant | Loaded boxes on trucks | 4 months | Atlanta, GA | To earn more money at Owens.

Left without telling them – just didn't show up. |
| "A warehouse" | Loaded trucks | 9 months | Atlanta, GA | Unclear (laid off &/or due to divorce and need to return home). |

**Respondent Name:** Glenn William Holladay                       page 8 of 38
**Case #:** 03-PT-1323-M

| Job | Responsibilities | Approx. length of employment | Place of employment (if known) | Reason for leaving |
|---|---|---|---|---|
| Chicken Plant | Stacked boxes in a cooler | 3 or 4 months | Gadsden, AL | Quit because felt that he was being over-worked. |
| Assistant to a roofer | Toted shingles and tore shingles off roofs. | "Off and on" | Gadsden, AL | N/A |
| Service Stations | Could only pump gas – ended the fill on the even dollar | "Never lasted too long" | Gadsden, AL | Lack of education & impaired ability to do the work. |
| Sawmill (part of work release program) | Stacked lumber | "Not even a month" | Gadsden, AL | The company went out of business |
| "I call it a self-job" | Picked up cans, bottles, and other junk with another person.<br><br>The other person "knew what to get" and sold the goods | "Off and on" | Gadsden, AL | N/A |
| Assisting father with painting | Only the "big stuff" (meaning painting things that required only gross motor movements).<br><br>Could not do detailed work.<br><br>Could not buy paint or materials because he did not know how and believed that he couldn't do it (above statements supported by both brothers' interviewed). | "Off and on" | Gadsden, AL | N/A |

Exhibit B

A N A L Y S I S  A N D  C O M M E N T A R Y

# The American Psychiatric Association's Resource Document on Mental Retardation and Capital Sentencing: Implementing *Atkins v. Virginia*

Richard J. Bonnie, LLB

State legislatures need guidance in implementing the United States Supreme Court's decision in *Atkins v. Virginia* barring execution of mentally retarded offenders. In this Resource Document, the American Psychiatric Association's Council on Psychiatry and Law, the component charged with developing policies and positions relating to forensic psychiatry, recommends statutory language addressing the definition of mental retardation, procedures relating to its assessment, and qualifications of testifying experts.

J Am Acad Psychiatry Law 32:304–8, 2004

In its recent decision in *Atkins v. Virginia*,[1] the United States Supreme Court ruled that the Eighth Amendment's prohibition against "cruel and unusual punishments" bars execution of mentally retarded offenders. At the time of the *Atkins* decision, 18 states and the federal government had already adopted laws categorically excluding defendants with mental retardation from the class of offenders convicted of capital crimes who can be sentenced to death. Several additional states, including Virginia, have adopted such statutes in the wake of the Supreme Court's decision. However, these statutes vary widely, and the Court's opinion in *Atkins* gave the states little guidance about how to implement the ruling or about the features of the existing statutes that are either constitutionally required or constitutionally permissible. Legislatures in the 38 states that enforce the death penalty are now reviewing their capital sentencing statutes in light of *Atkins* and other recent Supreme Court rulings pertaining to capital sentencing procedures.[2]

One of the striking aspects of the *Atkins* decision is that the constitutional prohibition appears to be framed in the language of a clinical diagnosis—"mental retardation"—and not in terms of a traditional legal concept, such as competence or responsibility. For this reason, state legislators can be expected to seek the guidance of psychiatrists and other mental health professionals in the drafting of post-*Atkins* statutes. This Resource Document is being published to assist members of the district branches of the American Psychiatric Association (APA) and other professional groups as they respond to legislative efforts to implement the *Atkins* decision in a way that is grounded in scientific knowledge and clinical experience and is consistent with the Supreme Court's ruling.

Many of the issues that must be resolved in drafting a post-*Atkins* statute are purely legal in nature and do not require or imply a need for psychiatric expertise. The two main legal questions are: who should bear the burden of persuasion on the matter of men-

Mr. Bonnie is John S. Battle Professor of Law, Professor of Psychiatric Medicine, and Director of the Institute of Law, Psychiatry and Public Policy, University of Virginia Schools of Law and Medicine, Charlottesville, VA. This Resource Document was drafted by Mr. Bonnie and was approved by the APA Council on Psychiatry and Law in May 2003. Address correspondence to: Richard J. Bonnie, LLB, 580 Massie Rd., Charlottesville, VA 22903. E-mail: rbonnie@virginia edu

SEP-12-2006 09:01 From:UA LAW SCHOOL LIB   2053481112   To:205 278 1963   P.3/7

Bonnie

tal retardation, and should an initial determination of mental retardation be made in a pretrial hearing by the judge before the capital sentencing proceeding. Alternative approaches to these questions are reflected in the statutes of Virginia[3] and New York.[4] Ellis[5] provides a full review of these procedural issues.

This document addresses three topics of particular concern to psychiatrists and other mental health professionals:

1. the definition of mental retardation and whether *Atkins* bars death sentences in a broader category of cases;

2. procedures to be followed by professionals who are charged with assessing whether capital defendants have mental retardation;

3. qualifications of experts selected to conduct these evaluations and to offer expert opinion on the pertinent issues.

## Definition

Several problems must be resolved in defining mental retardation, and state statutes reflect some variation on them:

1. The first question is whether mental retardation in this context should be defined in terms of a clinical diagnosis or in terms of diminished capacity to engage in mental tasks thought to be especially relevant to the assessment of criminal responsibility. Almost every state statute takes the diagnostic approach rather than the diminished-capacity approach, and the Council believes that a diminished-capacity approach is inconsistent with the Supreme Court's reasoning in *Atkins*. The Court's opinion repeatedly describes its holding as banning execution of "mentally retarded offenders," and the excluded category is defined diagnostically (not in terms of diminished capacity) in 17 of the 18 state statutes (as well as the federal statute) to which the Court refers in concluding that a national consensus has emerged against execution of the mentally retarded. In a particularly pertinent passage, Justice Stevens noted that "[t]o the extent that there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded" (Ref. 1, p 317), not whether defendants who are really retarded should be executed. In short, if a state were to define the excluded category in a way that allowed a person with an undisputed diagnosis of mental re-

tardation to be sentenced to death and executed, the Eighth Amendment would forbid the execution, and the statute would be unconstitutional as applied to that case.

2. Assuming that a diagnostic approach is taken, there are two main sources of definitional guidance: the manual of the American Association of Mental Retardation (AAMR) and the APA's Diagnostic and Statistical Manual. Although these two manuals use somewhat different language, they are conceptually equivalent. Each defines mental retardation as causing significant limitations in intellectual functioning and in adaptive behavior and as having developmental onset before the age of 18 years.

- In DSM-IV, mental retardation is defined as a disorder, with an onset before 18 years, characterized by "significantly subaverage intellectual functioning" and "concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety" (Ref. 6, p 39).
- In the 2002 AAMR Manual, mental retardation is defined as a disability originating before age 18, "characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills" (Ref. 7, p 13).

The AAMR Manual was revised in 2002 and provides the more recent of the two definitions. A state statute would be on safe ground in using either of these definitions or in intermingling the two. The Council has proposed alternatives, using the operative language of each of these two definitions in this Resource Document.

3. A key difficulty in legislative drafting has been whether "significant limitation in intellectual functioning" should be defined in terms of performance on so-called "IQ" tests and, if so, whether the definition should include specific reference to a cutoff score, as some state laws do. In the Council's view, incorporation of a specific cutoff score is inappropriate, not only because different tests have different scoring norms, but also because designating a specific score ignores the standard error of measurement and attributes greater precision to these measures than

SEP-12-2006 09:02 From:UA LAW SCHOOL LIB    2052348112         To:205 278 1963              P.4/7

they can support. The Council has defined a "significant limitation in intellectual functioning" as performance at least two standard deviations below the mean on an approved test rather than as a specific cutoff score.

The DSM-IV diagnostic criteria define significantly subaverage intellectual functioning as "an IQ of *approximately* 70 or below on an individually administered IQ test" (Ref. 6, p 46; emphasis added). The accompanying text makes it clear that the score of 70 is meant to be an approximation of a score two standard deviations below the mean, taking into account the standard error measurement, for the particular instrument being used.

4. The greatest challenge is to define a "significant limitation in adaptive behavior" because the DSM-IV and AAMR definitions use different language to operationalize the concept of adaptive functioning in terms of specific adaptive tasks. Because the concept is still being elaborated by experts in the field, standardized instruments are in a continuing process of development. It should be noted that the AAMR definition reflects the most recent scientific understanding of the concept of adaptive behavior. Under this conceptualization, explained in the AAMR Manual, the various skill areas mentioned in the previous AAMR definition and in the DSM-IV definition exemplify three basic domains of adaptive functioning (conceptual, social, and practical). The manual includes tables that sort various skills into these three domains and explains how currently available instruments operationalize and measure adaptive behavior.

5. Following the diagnostic approach endorsed in *Atkins*, the Council includes developmental origin in the definition (thereby excluding conditions involving deficits in intellectual and adaptive functioning acquired due to trauma or disease after age 18) on the basis that the Supreme Court's decision to bar death sentences for persons with mental retardation is grounded in presumed deficits in moral reasoning arising from disordered development. None of the statutes on which the Supreme Court relied in *Atkins* includes conditions acquired during adulthood, and such cases do not often arise. For anyone concerned that requiring developmental onset could lead to unfair treatment of defendants with adult-onset intellectual and adaptive deficits, it must be remembered that an individualized determination of diminished capacity at the time of the offense is still required in

cases in which persons with subaverage intellectual functioning have not been categorically excluded under *Atkins*.

The *Atkins* rationale also extends, in the Council's view, to some conditions in the category of "pervasive developmental disorders," especially autism. Ideally, an exclusionary provision should include these disorders, and eventually the Council will attempt to develop appropriate statutory language. However, because these disorders are usually accompanied by mental retardation, none of the exclusionary statutes covers them, and no prosecutions appear to have been brought in such cases, the Council concluded that proposing additional language at this time would unnecessarily complicate legislative efforts to respond to the *Atkins* decision in an expeditious manner.

Statutory language for the two alternative definitions follows.

## The AAMR Definition

*Mental retardation is a disability originating before the age of 18 and characterized concurrently by (1) significant limitations in intellectual functioning and (2) significant limitations in adaptive behavior, as expressed in conceptual, social, and practical adaptive skills. "Significant limitations in intellectual functioning" means performance that is at least two standard deviations below the mean, considering the standard error of measurement for the specific instruments used, as well as their strengths and limitations in the context of the particular assessment.*

## The DSM Definition

*Mental retardation is a disorder, with onset before 18 years, characterized by significantly subaverage intellectual functioning and concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. "Significantly subaverage intellectual functioning" means performance that is at least two standard deviations below the mean, considering the standard error of measurement for the specific instruments used, as well as their strengths and limitations in the context of the particular assessment.*

Obviously it is possible to combine language from the two definitions. In Virginia, for example, legislators sympathetic to prosecutorial or defense perspec-

tives tended to draw on the language in each definition that seemed more congenial to their point of view. In the end, the Virginia statute adopted the AAMR definition with the sole exception of using the DSM-IV language "significantly subaverage" intellectual functioning rather than "significant limitation in" such functioning, as used in the AAMR (see Ref. 3).

## Assessment

In light of the heightened "need for reliability" in capital sentencing,[8] it is particularly important to promote the highest quality of assessment and to minimize unnecessary variation from accepted professional standards. The diagnosis of mental retardation lends itself to greater specification of practice standards than other forensic assessments, and the Council has embraced the approach taken in the Virginia statute. Specifically, state laws should:

- require use of at least one standardized test for measuring intellectual functioning, administered in conformance with accepted professional practice by a person skilled in the administration, scoring, and interpretation of such tests;
- encourage use of at least one standardized measure of adaptive behavior while recognizing the ultimate need for clinical judgment;
- require efforts to obtain pertinent written records and to conduct interviews with people who have interacted with the defendant; and
- permit, but not require, the assessment of mental retardation to be combined with other mental health assessments conducted in the case and provide all the procedural protection applicable to other forensic mental health assessments in capital cases.

*Assessments of mental retardation under this section shall conform to the following requirements:*

*1. Assessment of intellectual functioning shall include administration of at least one standardized measure generally accepted by the field of mental health assessment and appropriate for administration to the particular person being assessed, taking into account cultural, linguistic, sensory, motor, behavioral, and other individual factors. Testing of intellectual functioning should be carried out in conformity with accepted professional practice by a person skilled in the administration, scor-*

*ing, and interpretation of such tests, and, whenever indicated, the assessment should include information from multiple sources.*

*2. Assessment of adaptive behavior shall be based on multiple sources of information, including clinical interview; psychological test results; and educational, correctional, and vocational records, and shall include, whenever feasible, at least one standardized measure for assessing adaptive behavior, administered by a person skilled in the administration, scoring, and interpretation of such instruments, in accordance with methods generally accepted by the field of mental health assessment and appropriate for administration to the particular person being assessed, taking into account the environments in which the person has lived, as well as cultural, linguistic, sensory, motor, behavioral, and other individual factors. In reaching a clinical judgment regarding whether the person exhibits significant limitations in adaptive behavior, the examiner shall give performance on standardized measures whatever weight is clinically appropriate in light of the person's history and characteristics and the context of the assessment.*

*3. Assessment of developmental origin shall be based on multiple sources of information generally accepted in the field of mental health assessment, including, whenever available, educational, social service, medical records, prior disability assessments, parental or caregiver reports, and other collateral data, recognizing that valid clinical assessments conducted during the person's childhood may not have conformed to current practice standards.*

## Qualifications of Experts

The expert selected or appointed to conduct mental retardation evaluations in capital cases should be a psychiatrist or psychologist who is qualified by training and experience to make a diagnosis of mental retardation. The testing of intellectual functioning and adaptive behavior should be carried out by clinicians who have the necessary skill and experience. Finally, if the expert appointed or selected lacks training and experience in conducting forensic assessments and testifying in criminal adjudications, he or she should obtain a consultation with a psychiatrist or other qualified professional with such experience.

*An expert appointed by the court to assess whether a capital defendant has mental retardation or whose opinion is admitted into evidence on this matter should be a*

SEP-12-2006 09:03 From:UA LAW SCHOOL LIB    2053481112        TO:205 278 1963        P.6/7

Mental Retardation and Capital Sentencing

*psychiatrist or clinical psychologist who is qualified by training and experience to make a diagnosis of mental retardation. Standardized testing required under this section and relied on by the appointed or testifying expert shall be carried out by a mental health professional skilled in the administration, scoring and interpretation of intelligence tests and measures of adaptive behavior. If the expert lacks training and experience in conducting forensic assessments and testifying in criminal adjudications, he or she should obtain a consultation with a psychiatrist or other qualified professional with such experience.*

## References

1. Atkins v. Virginia, 536 U.S. 304 (2002)
2. Ring v. Arizona, 536 U.S. 584 (2002)
3. Va. Code. Ann. § 19 2-264.3:1.1, 1.2 (Michie Supp. 2003)
4. N.Y Crim. Proc. Law § 400.27 (12)-(14) (McKinney Supp. 2004)
5. Ellis JW: Mental retardation and the death penalty: a guide to state legislative issues Ment Phys Disabil Law Rep 27:11–24, 2003
6. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders (ed 4). Washington, DC: American Psychiatric Association, 1994
7. American Association on Mental Retardation: Mental Retardation (ed 10). Washington, DC: AAMR, 2002
8. Woodson v. North Carolina, 428 U.S. 280, 305 (1976)